UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

INSTITUTIONAL SHAREHOLDER SERVICES, INC.,

PLAINTIFF-APPELLEE,

v.

SECURITIES AND EXCHANGE COMMISSION and GARY
GENSLER in his official capacity as Chair of the
Securities and Exchange Commission,

DEFENDANT-APPELLANTS.

No. 24-5105
(consolidated with
24-5112)

---

## UNDERLYING DECISION FROM WHICH APPEAL ARISES

Pursuant to the Court's Order of April 25, 2024, Defendant-Appellants

Securities and Exchange Commission and Gary Gensler, in his official capacity as

Chair of the Securities and Exchange Commission, hereby submit the underlying

decision from which this appeal arises.

Respectfully submitted,

MEGAN BARBERO                          /s/ Daniel E. Matro
General Counsel                        DANIEL E. MATRO
                                       Senior Appellate Counsel
MICHAEL A. CONLEY                      Securities and Exchange Commission
Solicitor                              100 F Street, N.E.
                                       Washington, D.C. 20549
TRACEY A. HARDIN                       (202) 551-8248 (Matro)
Assistant General Counsel

Dated:  May 28, 2024                   *Counsel for Defendant-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2024, I electronically filed the foregoing document using the Court's CM/ECF system, which will send notice to all the parties.

/s/ *Daniel E. Matro*
Daniel E. Matro

May 28, 2024

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| **INSTITUTIONAL SHAREHOLDER** ) | |
| **SERVICES INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil No. 19-cv-3275 (APM)** |
| ) | |
| **SECURITIES AND** ) | |
| **EXCHANGE COMMISSION et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**<u>MEMORANDUM OPINION</u>**[1]

**I.**

Section 14(a) of the Securities Exchange Act of 1934 makes it unlawful to "solicit" proxies "in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors[.]" 15 U.S.C. § 78n(a). This case concerns whether proxy advisory firms "solicit" proxies within the meaning of Section 14(a).

**A.**

Public company governance, at its highest level, occurs through annual and special shareholders meetings. At such meetings, shareholders vote on a variety of issues, including selecting directors, setting executive pay, and approving or rejecting major transactions, such as mergers and acquisitions. Shareholders may vote on these matters in person or, more commonly, through someone who is appointed as a "proxy." How to vote on a corporate ballot proposal can

---

[1] The court apologies to the parties and counsel for the length of time it has taken to issue this decision.

sometimes be a complex determination.  Larger investors, like pension plans, mutual funds, and asset managers, turn to specialists—known as "proxy advisors"—for analysis and guidance. Reliance on proxy advisory firms, and their impact on vote outcomes, has steadily grown over the past 25 years.

In August 2019, Defendant Securities and Exchange Commission ("SEC" or "Commission") issued "an interpretation and related guidance regarding the applicability of the federal proxy rules to proxy voting advice provided by proxy advisory firms."  *Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice*, 84 Fed. Reg. 47416, 47416 (Sept. 10, 2019).  The "federal proxy rules" are the agency's regulations implementing Section 14(a).  Specifically, the SEC said that "proxy voting advice constitutes a 'solicitation' under the federal proxy rules," and "Rule 14a-9 under the Exchange Act [applies] to proxy voting advice."  *Id.*  In other words, according to the Commission, proxy voting advice was "solicitation" for purposes of Section 14(a) and its implementing regulations. Following a period of notice and comment, in September 2020, the SEC issued a final rule that confirmed its earlier interpretation and guidance.  *Exemptions from the Proxy Rules for Proxy Voting Advice*, 85 Fed. Reg. 55082 (Sept. 3, 2020).  The final rule amended the proxy rules' definition of the terms "solicit" and "solicitation" to expressly include the furnishing of "proxy voting advice" for a fee.  17 C.F.R. § 240.14a-1(l)(1)(iii)(A).  As a result, proxy advisory firms are subject to regulation by the SEC under the proxy rules.

Plaintiff Institutional Shareholder Services, Inc. ("ISS") is one of the country's largest proxy advisory firms.  It filed this action to challenge the SEC's extension of the proxy rules to proxy voting advice.  Specifically, Plaintiff contends that proxy advisory firms do not "solicit" proxies, as that term is used in Section 14(a) of the Exchange Act, because they do not seek proxy

authority or ask shareholders to vote a certain way in order to achieve a particular outcome. Naturally, the SEC disagrees and defends its amendment of the rules. So, too, does Intervenor-Defendant National Association of Manufacturers ("NAM"). According to Defendants, proxy advisors "solicit" proxies in the sense that advisors move shareholders to vote or, alternatively, endeavor to obtain votes consistent with their advice.

Before the court are the parties' motions for summary judgment. The court holds that the SEC acted contrary to law and in excess of statutory authority when it amended the proxy rules' definition of "solicit" and "solicitation" to include proxy voting advice for a fee. The ordinary meaning of those terms when Congress enacted the Exchange Act in 1934 did not encompass voting advice delivered by a person or firm with no interest in the outcome of the vote. Accordingly, the court grants Plaintiff's motion and denies the motions filed by the SEC and NAM.

**B.**

**1.**

Unless exempted, the SEC's proxy rules apply to "every solicitation of a proxy with respect to securities registered pursuant to Section 12 of the Act." *Id.* § 240.14a-2. Those rules generally prohibit the solicitation of a proxy unless the person solicited is furnished with a written proxy statement that contains detailed information about the matter for which the proxy is solicited. *Id.* § 240.14a-3. The rules also impose filing requirements of preliminary and final proxy statements with the SEC, which typically are made available to the public. *Id.* § 240.14a-6. The purpose of these requirements is "to improve . . . communications" with potential absentee voters and "thereby to enable proxy voters to control the corporation as effectively as they might have by attending a shareholder meeting." *Bus. Roundtable v. SEC*, 905 F.2d 406, 410 (D.C. Cir. 1990); *see also J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964) ("The purpose of § 14(a) is to prevent

3

management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation.").

Another key element of the proxy regulations is its "antifraud" provision.  That rule makes unlawful any covered communication that contains materially "false or misleading" information or omissions.  17 C.F.R. § 240.14a-9.  A violation of the anti-fraud provision can subject a person to both agency enforcement and a private civil suit.  *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 444 (1976).

## 2.

Congress did not define the term "solicit" in the Exchange Act.  The SEC filled the gap.  The agency has long defined the terms "solicit" and "solicitation" to include a "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy."   17 C.F.R. § 240.14a-1(l)(1)(iii); *Amendments to Proxy Rules*, 21 Fed. Reg. 577 (Jan. 26, 1956).  Over the years, the agency has opined on whether proxy voting advice constitutes "solicitation" under that definition.   The court describes this history below.

### a.

The SEC issued the first of these opinions in 1964.  Back then, the SEC expressed the view that broker-dealers who gave advice on proxy voting in certain circumstances were "soliciting" a proxy and therefore subject to the proxy rules.  *Broker-Dealer Participation in Proxy Solicitation*, 29 Fed. Reg. 341 (Jan. 15, 1964).  The agency explained that "the proxy rules apply to any person—not just management, or the opposition."  *Id.* at 341.  Such broader coverage was "necessary in order to assure that all materials specifically directed to stockholders and which are related to, and influence their voting will meet the standards of the rules."  *Id.*  By way of

illustration, the Commission offered that "[m]aterial distributed during a period while proxy solicitation is in progress, which comments upon the issues to be voted on or which suggests how the stockholder should vote, would constitute soliciting material." *Id.* Ultimately, whether a broker-dealer's "transmission of material to security holders" was "solicitation" "depend[ed] upon whether the material [was] of a nature calculated to influence the voting." *Id.* at 342.

The SEC issued the next relevant opinion in 1979. Then, the SEC addressed the concern that, "in view of the broad definition of the term 'solicitation' under the proxy rules," the rules did "not provide realistic opportunities for financial analysts and others in the business of providing financial advice to furnish proxy voting advice, on an unsolicited basis, to their customers." *S'holder Commc'ns, S'holder Participation in the Corporate Electoral Process and Corporate Governance Generally*, 44 Fed. Reg. 48938, 48941 (Aug. 20, 1979). Citing its 1964 opinion, the agency noted that, "[a]s a general matter, unsolicited proxy voting advice would constitute a 'solicitation' subject to the proxy rules." *Id.* at 48941 n.25. Nevertheless, to avoid its rules becoming an "unreasonable impediment to the flow of information to shareholders from professional financial advisors," *id.* at 48941, the SEC amended its proxy rules to exempt financial advisors from certain written and filing requirements, so long as the advisor disclosed conflicts and complied with other conditions. *S'holder Commc'ns, S'holder Participation in the Corporate Electoral Process and Corporate Governance Generally*, 44 Fed. Reg. 68764, 68766–67 (Nov. 29, 1979); 17 C.F.R. § 240.14a-2(b)(3).

In 1992, as part of a rulemaking, the SEC made passing reference to the status of proxy voting advice. The Commission recognized that "[t]he literal breadth of the new definition of solicitation [adopted in 1956] was so great as potentially to turn almost every expression of opinion concerning a publicly-traded corporation into a regulated proxy solicitation." *Regulation of*

*Commc'ns Among S'holders*, 57 Fed. Reg. 48276, 48278 (Oct. 22, 1992).  In response to that concern, the agency left its definition of "solicitation" unchanged, and instead created an additional exemption from the proxy rules.  Under this exemption, as a general matter, persons who do not seek to act as proxies need not comply with the proxy rules.  *See id.* at 48281–82; 17 C.F.R. § 240.14a-2(b)(1).  Notably, the agency said that "proxy advisory services in the ordinary course of business [are] covered by the exemption," citing what is now Rule 14a-2(b)(3).  57 Fed. Reg. at 48282 n.41.

**b.**

The agency addressed the subject of proxy voting head on in 2010.  That summer, the SEC issued a "concept release" to solicit comment on various aspects of the proxy system.  *Concept Release on the U.S. Proxy System*, 75 Fed. Reg. 42982 (July 22, 2010).  One of the topics the agency addressed was proxy advisory firms.  *Id.* at 43009–14.  The Commission observed that "[o]ver the last twenty-five years, institutional investors . . . have substantially increased their use of proxy advisory firms[.]" *Id.* at 43009.  The agency also noted that issuers had come to rely on proxy advisory firms to provide guidance on corporate governance and executive compensation matters.  *Id.*

The SEC explained that, depending on their activities, proxy advisory firms could be subject to the federal securities law in one of two ways.  "First, because of the breadth of the definition of 'solicitation,' proxy advisory firms may be subject to our proxy rules because they provide recommendations that are reasonably calculated to result in the procurement, withholding, or revocation of a proxy." *Id.*  The agency noted, however, that it had treated proxy advisory firms as exempt from the proxy rules under Rule 14a-2(b)(3), subject to certain conditions.  *Id.*  Second, the agency said that proxy advisory firms could meet the definition of "investment adviser under

the Advisers Act and thus are subject to regulation under that Act." *Id.* at 43010. If qualified as an investment advisor, proxy advisory firms would be subject to the Act's antifraud provisions and, if registered as an advisor, required to make various disclosures. *Id.* at 43010–11.

The SEC included proxy advisory firms as a topic in its concept release because of various concerns voiced about their role in the proxy voting process. *Id.* at 43011. The SEC invited comment on two main concerns: conflicts of interest faced by proxy advisors and the lack of accuracy and transparency in formulating voting recommendations. *Id.* at 43011–12. The agency offered potential solutions to address these issues and requested public comment. *Id.* at 43012–13.

**c.**

Almost a decade later, the SEC began incrementally moving towards codifying proxy voting advice for a fee as "solicitation" for purposes of Section 14(a) and the proxy rules.

In September 2019, the SEC issued a guidance titled, "Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice" ("Proxy Guidance"). 84 Fed. Reg. 47416 (Sept. 10, 2019). The agency expressed the view that proxy advisory services constituted "solicitation" within the meaning of the proxy rules. *Id.* at 47417 (citing 17 C.F.R. § 240.14a-1(l)(1)(iii)). According to the Commission, proxy advisors engaged in "solicitation" because they present "a 'vote recommendation' for each proposal that indicates how [a] client should vote" and "market[] . . . their expertise in researching and analyzing proxy issues for purposes of helping clients make proxy voting determinations." *Id.* at 47417–19. "The fact that proxy advisory firms typically provide their recommendations shortly before a shareholder meeting further enhances the likelihood that the recommendations are designed to . . . influence" shareholders' voting decisions. *Id.* at 47418. Then, in December 2019, the agency

7

announced a rulemaking to address the role of proxy advisory firms consistent with the issued

guidance. *Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice*, 84 Fed. Reg.

66518 (Dec. 4, 2019).

The Commission issued its final rule in September 2020. *Exemptions from the Proxy Rules
for Proxy Voting Advice*, 85 Fed. Reg. 55082 (Sept. 3, 2020) ("Final Rule"). It explained that the

Final Rule would "help ensure that investors who use proxy voting advice have access to more

complete, accurate, and transparent information and are able to benefit from a robust discussion of

views" when voting. *Id.* at 55122–23. The agency expected "the final amendments to reduce

information asymmetries between proxy voting advice businesses and their clients by eliciting

more tailored and comprehensive disclosure of conflicts of interest and by facilitating client access

to more complete information on matters that are the subject of proxy voting advice." *Id.* at 55123.

Most significantly, the SEC amended the regulations "to make clear" that the definition

of "solicit" and "solicitation" included

> [a]ny proxy voting advice that makes a recommendation to a
> security holder as to its vote, consent, or authorization on a specific
> matter for which security holder approval is solicited, and that is
> furnished by a person that markets its expertise as a provider of such
> proxy voting advice, separately from other forms of investment
> advice, and sells such proxy voting advice for a fee.

*Id.* at 55154; 17 C.F.R. § 240.14a-1(l)(1)(iii)(A). The Final Rule expressly exempted from the

definition of "solicit" and "solicitation" "[t]he furnishing of any proxy voting advice by a person

who furnishes such advice only in response to an unprompted request." 85 Fed. Reg. at 55154;

17 C.F.R. § 240.14a-1(l)(2)(v).

As a result of the definitional amendment, proxy advisory firms became presumptively

subject to the proxy rules' information and filing requirements. The Final Rule, however, provided

that the firms could avoid those burdens, as they had historically, by meeting certain new

conditions.  The first required the firms to make conflict-of-interest disclosures,[2] and to publish the steps taken to identify such conflicts.  85 Fed. Reg. at 55154; 17 C.F.R. § 240.14a-2(b)(9).  The second required proxy advisory firms to adopt policies and procedures to ensure that corporate issuers of securities that are the subject of "proxy voting advice have such advice made available to them at or prior to the time when such advice is disseminated to the proxy voting advice business's clients."  85 Fed. Reg. at 55154.  And the third stated that proxy advisors would have to establish a mechanism to inform clients of the registrant's response to the proxy advice before the shareholder meeting.  *Id.*  These three conditions were "designed to facilitate more complete and robust dialogue and information sharing among proxy voting advice businesses, their clients, and registrants," which "would improve the proxy voting system, and ultimately lead to more informed decision-making, to the benefit of all participants[.]"  *Id.* at 55107.

Last, the Final Rule amended the Notes to the anti-fraud provision, 17 C.F.R. § 240.14a-9, to make explicit that a firm's "failure to disclose material information" about its proxy voting advice could constitute false or misleading information.  85 Fed. Reg. at 55155.

### 3.

With that historical context in mind, the court returns to the instant matter.  The procedural history of this case is intertwined with later regulatory developments, which ultimately caused a narrowing of the claims now at issue.  The court takes a few moments to discuss these twists and turns.

Soon after the SEC published its Proxy Guidance, Plaintiff ISS filed this action in October 2019.  Compl., ECF No. 1.  The Complaint generally claimed that "[i]t is contrary to law for the

---

[2] The conflicts disclosure requirement covers "[a]ny information regarding an interest, transaction, or relationship of the proxy voting advice business (or its affiliates) that is material to assessing the objectivity of the proxy voting advice in light of the circumstances of the particular interest, transaction, or relationship."  17 C.F.R. § 240.14a-2(b)(9)(i).

SEC to regulate proxy voting advice provided in a fiduciary capacity to fee-paying clients as though it were akin to proxy solicitation by a person seeking to achieve a certain outcome in a shareholder vote." *Id.* ¶ 65. Plaintiff asserted that the SEC had violated the Administrative Procedure Act ("APA") by (1) adopting an interpretation of "solicit" that was contrary to law and arbitrary and capricious, and (2) by failing to subject the Proxy Guidance to notice and comment. *Id.* ¶¶ 61–83. Thereafter, at the parties' request, the court held the case in abeyance while the Commission completed its ongoing rulemaking. Unopposed Mot. to Hold Case in Abeyance, ECF No. 12; Order, ECF No. 14.

After the Commission published the Final Rule, the court lifted the stay, and Plaintiff proceeded to amend its Complaint. *See* Am. Compl., ECF No. 19 [hereinafter Am. Compl.]. The amended pleading contained six claims for relief, each arising under the APA. Plaintiff alleged that (1) proxy advisory firms do not "solicit a proxy" under Section 14(a) of the Exchange Act and therefore the SEC's interpretation was contrary to law (Count I), *id.* ¶¶ 74–78; (2) the SEC's regulation of proxy advisory firms exceeded its lawful authority (Count II), *id.* ¶¶ 79–82; (3) the Final Rules were arbitrary and capricious insofar as the agency "failed to articulate a reasonable explanation for why the Final Rules were needed at all" and failed to consider why existing regulation under the Advisers Act "is inadequate to address [the] purported concerns about proxy voting advice" (Count III), *id.* ¶¶ 86, 87, 83–88; (4) the Proxy Guidance was arbitrary and capricious for the same reasons as the Final Rule (Count IV), *id.* ¶¶ 89–90; (5) two of the Final Rule's new exemption conditions—that proxy advisory firms disclose their voting recommendations to issuers and make issuers' responses available to their clients—abridged advisors' First Amendment right of free expression (Count V), *id.* ¶¶ 91–97; and (6) the SEC failed to follow required notice-and-comment rulemaking when issuing the Proxy Guidance (Count VI),

*id.* ¶¶ 98–107.[3]  NAM then filed a motion to intervene as a defendant, NAM's Mot. to Intervene

in Supp. of Defs., ECF No. 27, which the court granted, Minute Order, July 27, 2022.

The parties then briefed their motions for summary judgment.  *See* Pl.'s Mot. for Summ. J.,

ECF No. 20 [hereinafter Pl.'s Mot.]; Def. SEC's Cross-Mot. for Summ. J., ECF No. 35 [hereinafter

SEC Mot.]; Mem. in Supp. of NAM's Cross-Mot. for Summ. J. & Opp'n to Pl.'s Mot., ECF No.

33-2 [hereinafter NAM's Mem.].  However, just days before the scheduled oral argument, the

parties again jointly moved to hold the case in abeyance.  Unopposed Mot. to Hold Case in

Abeyance, ECF No. 53.  The SEC had decided "to consider whether the proxy rule amendments

challenged by [Plaintiff ISS] in this litigation should be revisited through further rulemaking." *Id.*

at 1.  The agency also announced that it would not enforce the new rules "during the period in

which the Commission [was] considering further regulatory action in this area." *Id.* at 3.  The

court agreed to stay the case.  Order Granting Defs.' Unopposed Mot. to Hold Case in Abeyance,

ECF No. 56.[4]

In November 2021, the SEC announced that it had concluded its review of the Final Rule.

It proposed rescinding two of the three new conditions that, if satisfied, would exempt proxy voting

advice from Rule 14(a)'s information and filing requirements.  *Proxy Voting Advice*, 86 Fed. Reg.

67383, 67387 (Nov. 26, 2021).  Specifically, the SEC proposed eliminating the requirements that

proxy advisory firms disclose their advice to corporate issuers and provide their clients with the

issuers' responses.  *Id.* at 67388.  The conflict-of-interests disclosure condition would remain,

however. *Id.*  The agency also proposed removing the Note amendment to the anti-fraud provision,

---

[3] Plaintiff does not offer any argument as to Count VI in its motion for summary judgment.  *See generally* Pl.'s Mem. of P&A in Supp. of Pl.'s Mot. for Summ. J., ECF No. 20-1.  Accordingly, the court treats that claim as abandoned. *See Env't Def. v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69, 74 n.1 (D.D.C. 2007).
[4] The agency's decision to stay enforcement prompted a challenge filed by NAM in a separate action in the Western District of Texas.  Compl. for Decl. & Inj. Relief, *Nat'l Ass'n of Mfrs. v. SEC*, No. 7:21-cv-183 (DC) (W.D. Tex.), ECF No. 1.

Rule 14a-9.  *Id.* at 67390.  Importantly, the agency did not change its position that proxy voting advice for a fee constituted "solicitation," and it therefore left that definitional amendment unchanged.  *Id.* at 67384.  In light of ongoing rulemaking, and at the parties' request, the court agreed to continue to hold the case "in abeyance until the earlier of March 31, 2022, or the promulgation of final rule amendments addressing proxy voting advice."  Order Granting Defs.' Mot. to Continue Abeyance, ECF No. 58.

By the end of March 2022, the agency had not yet completed the rulemaking process and again sought to continue this matter.  Defs.' Status Report and Mot. to Continue Abeyance, ECF No. 61.  This time, however, Plaintiff opposed the agency's request.  Pl.'s Opp'n to Defs.' Mot. to Continue Abeyance, ECF No. 62.  The court agreed with Plaintiff, ruling that because the SEC had not proposed to withdraw proxy voting advice from the amended definition of "solicit" and "solicitation," the case should move forward as to the claims challenging the definitional amendment.  Minute Order, Apr. 17, 2022.

On July 13, 2022, the Commission adopted a final rule that rescinded the two conditions the agency had proposed to excise in November 2021.  *Proxy Voting Advice*, 87 Fed. Reg. 43168 (July 19, 2022) ("Amended Final Rule").  The Amended Final Rule rendered moot Count V of the Amended Complaint (the First Amendment claim) and Count III of the Amended Complaint (the Proxy Guidance challenge) to the extent those claims covered the rescinded provisions.  Notice, ECF No. 64; *see also Alaska v. Dep't of Agric.*, 17 F.4th 1224, 1226 (D.C. Cir. 2021) ("A well-settled principle of law is this: when an agency has rescinded and replaced a challenged regulation, litigation over the legality of the original regulation becomes moot.").  What remained then were Plaintiff's various challenges to the agency's definitional amendment of the terms "solicit" and "solicitation" to include proxy voting advice by proxy advisory firms.

The court thereafter held a status conference on July 27, 2022, during which it *sua sponte* raised two questions of justiciability given the agency's rescinding of key aspects of the Final Rule. The court asked (1) whether Plaintiff still had a cognizable injury, and thus standing, to pursue the remaining claims and (2) whether the remaining claims were ripe for adjudication.  The court so inquired because the only challenges left to the Final Rule were to its definitional amendment and the conflicts disclosure provision, and Plaintiff had observed in its motion for summary judgment that it already was subject to conflicts disclosures under the Advisers Act.  Pl.'s Mem. of P&A in Supp. of Pl.'s Mot., ECF No. 20-1 [hereinafter Pl.'s Mem.], at 7–9, 31–32.  For the court, that fact suggested an absence of injury, which gave rise to its questions on justiciability.  The court asked the parties to submit additional briefing on those issues.  Pl.'s Suppl. Br., ECF No. 65; SEC Defs.' Suppl. Br., ECF No. 66; NAM's Suppl. Br., ECF No. 67.[5]

### III.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In an APA matter, "the reviewing court generally reviews the agency's decision as an appellate court addressing issues of law."  *Pol'y & Rsch., LLC v. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 74 (D.D.C. 2018) (cleaned up).  The court is limited "to the administrative record and the facts and reasons contained therein to determine whether the agency's action was consistent with the relevant APA standard of review."  *Id.* (internal quotation marks omitted).

Under the APA, an agency action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A).

---

[5] At the end of September 2022, a court in the Western District of Texas held that the SEC's suspension of the Final Rules' compliance date violated the APA.  The court enjoined the agency from further "refusing to acknowledge or recognize" that the Final Rules are presently in effect.  Ex. A to Notice, ECF No. 68-1, at 9.

The arbitrary-and-capricious standard is "highly deferential" and "presumes the validity of agency action." *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (internal quotation marks omitted).

## IV.

### A.

The court starts with the two questions of justiciability that it raised *sua sponte.* It finds that there is no threshold impediment to review.

### 1.

All parties agree that, notwithstanding the agency's amendment of the Final Rules, Plaintiff has standing to pursue its remaining claims. Pl.'s Suppl. Br. at 2–3; SEC Defs.' Suppl. Br. at 2–3; NAM's Suppl. Br. at 2–4. The parties' supplemental briefing understandably focused on the standing inquiry. After all, the court raised the question of ongoing injury after the agency rescinded two of the proposed exemption conditions. But the court's focus on standing was misplaced. The proper concern is instead mootness.

Although standing and mootness are "related concepts," their application is measured at different times. *Garden State Broad. Ltd. P'ship v. FCC*, 996 F.2d 386, 394 (D.C. Cir. 1993). "The Supreme Court has characterized mootness as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Id.* (quoting *U. S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)) (internal quotation marks omitted). Plaintiff had the requisite injury when it filed suit. The proper question is whether its remaining claims are now moot.

"In general, a case becomes moot 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *Conservation Force, Inc. v. Jewell*, 733

F.3d 1200, 1204 (D.C. Cir. 2013) (quoting *Larsen v. U.S. Navy*, 525 F.3d 1, 3 (D.C. Cir. 2008)).

This can occur "when, among other things, the court can provide no effective remedy because a

party has already obtained all the relief that it has sought." *Id.* (quoting *Monzillo v. Biller*, 735

F.2d 1456, 1459 (D.C. Cir. 1984)) (cleaned up).

Plaintiff has not obtained all the relief that it seeks.  It asks the court to vacate and set aside

the Final Rule and the Proxy Guidance as contrary to law or in excess of agency authority, in part

because it unlawfully defines proxy voting advice as "solicitation" under Section 14(a) of the

Exchange Act.  Am. Compl. at 29–30.  That is relief the court still can grant.  *See Am. Bioscience

Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (a plaintiff who "prevails on its APA

claim . . . is entitled to relief under that statute, which normally will be a vacatur").  The suit

therefore is not moot.

## 2.

The parties also agree that Plaintiff's remaining claims are ripe for review.  Pl.'s Suppl. Br.

at 4–6; SEC Defs.' Suppl. Br. at 4; NAM's Suppl. Br. at 4–8.  The court does as well.

"Ripeness, while often spoken of as a justiciability doctrine distinct from standing, in fact

shares [its] constitutional requirement . . . that an injury in fact be certainly impending." *Nat'l

Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996).   In the

administrative law context, a party is "materially harmed by the additional regulatory burden

imposed upon [it] as the result of a federal agency's unlawful adoption of a rule[.]" *Ass'n of Am.

R.R.'s v. Dep't of Transp.*, 38 F.3d 582, 586 (D.C. Cir. 1994).  The D.C. Circuit has explained that

"even a small financial injury is enough" to confer standing.  *Competitive Enter. Inst. v. FCC*, 970

F.3d 372, 384 (D.C. Cir. 2020); *see also Carpenters Indus. Council v. Zinke*, 854 F. 3d 1, 5 (D.C.

Cir. 2017) ("[T]he amount [of harm] is irrelevant.  A dollar of economic harm is still an injury-in-fact for standing purposes.").

Plaintiff says that it meets this injury standard because it "is now subject to additional regulatory obligations."  Pl.'s Suppl. Br. at 2.  Namely, because the Final Rule definitively classifies the provision of proxy voting advice for a fee as proxy "solicitation," Plaintiff is left with two burdensome alternatives: either "(1) comply with the . . . information-and-filing requirements applicable to traditional solicitations . . . or (2) reconfigure its electronic delivery platform to meet prescriptive new conflict-of-interest and policy and procedure disclosure requirements" that would exempt it from those requirements.  *Id.* at 1–2.  The court is satisfied that this additional burden that the Final Rule places on Plaintiff establishes an injury that is "certainly impending."  *Nat'l Treasury Emps. Union*, 101 F.3d at 1427.

Ripeness also has a prudential component.  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (Even if a case is "constitutionally ripe," there may also be "prudential reasons for refusing to exercise jurisdiction.").  A court must ask, in essence, whether it "*should* decide a case."  *Am. Petrol. Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012) (emphasis added).  In making that determination, "a court balances the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Nat'l Treasury Emps. Union*, 101 F.3d at 1427 (internal quotation marks omitted).

At the July 2022 status conference, the court expressed misgivings about the prudential ripeness of this matter because it seemed that the regulatory burden placed upon Plaintiff by the Final Rule was minimal.  The Final Rule's most immediate effect was that Plaintiff would have to make conflicts disclosures similar to those it already makes under the Advisers Act.  Pl.'s Suppl. Br. at 5–6.  The court identified various D.C. Circuit cases holding that various APA disputes were

not ripe for prudential reasons. *See Chlorine Inst., Inc. v. Fed. R.R. Admin.*, 718 F.3d 922 (D.C. Cir. 2013); *Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421 (D.C. Cir. 2007); *Am. Tort Reform Assoc. v. OSHA*, 738 F.3d 387 (D.C. Cir. 2013). The court is now satisfied that each of these cases is distinguishable. Because the amended definition of "solicitation" to include proxy voting advice is codified in a binding final rule (unlike *American Tort Reform Association*), and because the amendment is imposing tangible, concrete regulatory obligations on Plaintiff right now (unlike the challenged actions in *Chlorine Institute* and *Devia*), the matter is prudentially ripe for the court's consideration. Pl.'s Suppl. Br. at 7.

## B.

At long last, the court arrives at the merits. The court starts (and ends) with Plaintiff's claims in Counts I and II that the Final Rule and the Proxy Guidance, respectively, are "not in accordance with law" or are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

## 1.

The crux of those claims is that proxy voting advice is not "solicitation" under Section 14(a) of the Exchange Act. Am. Compl. ¶¶ 77, 82. Plaintiff starts from the premise that, when Congress enacted Section 14(a) in 1934, the ordinary meaning of "solicit" was to "[i]nvite, make appeals or requests to, importune." Pl.'s Mem. at 17 (citing THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH, 1150 (1931); BLACK'S LAW DICTIONARY (3d ed. 1933) (defining "solicit" as "[t]o ask for with earnestness, to make petition to, to endeavor to obtain, to awake or excite to action, to appeal to, to invite")). "Reading Section 14(a) consistent with [this] ordinary, contemporaneous meaning," Plaintiff contends, the words "solicit any proxy" in Section 14(a) "plainly refers to actions taken by a person who seeks to achieve a certain outcome

in a proxy vote." Pl.'s Mem. at 18. Thus, a "solicitor—one who 'endeavors to obtain' something by 'asking or pleading'—necessarily has a certain objective . . . and engages in solicitation in an attempt to achieve that objective." *Id.* In this way, Plaintiff says, "the phrase 'solicit any proxy' . . . has a clear and unambiguous meaning: to seek proxy authority or ask a shareholder to vote a certain way in order to achieve a specific outcome in a shareholder vote." *Id.* Proxy advisory firms do not "solicit" proxies because they "do not seek to support one side or the other in a contested proxy vote and are indifferent to the ultimate outcome of the vote." *Id.*

The SEC and NAM respond to Plaintiff's ordinary-meaning argument in slightly different ways. The SEC contends that the term "solicit" is inherently vague. It favors a "'competing, plausible interpretation[ ] that precludes ISS from prevailing at *Chevron* step one." SEC's Mem. in Supp. of SEC's Mot. and in Opp'n to Pl.'s Mot., ECF No. 35-1 [hereinafter SEC Mem.], at 22 (quoting *Am. Coal. Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 796 F.3d 18, 26 (D.C. Cir. 2015)). The SEC asserts that, at the time of the Exchange Act's enactment, "solicit" also could mean "to move to action" or "to urge" or to "insist upon." *Id.* (quoting WEBSTER'S NEW INTERNATIONAL DICTIONARY 2393 (2d 1934)); *see also* Final Rule at 55092 & n.137 (citing foregoing definition). This "broader meaning," the SEC contends, captures the act of giving advice to influence a client's voting decisions in exchange for a fee. SEC Mem. at 24. To "solicit" does not require "an interest in obtaining a particular outcome." *Id.* at 22.

NAM does not pick a side in the definitional dispute. It contends that "proxy voting advice to a client" "easily satisfies" both Plaintiff's and the SEC's preferred meanings. NAM's Mem. at 13. It argues that Plaintiff "solicits a proxy" because it both "'endeavors to obtain' a vote in line with its [voting] recommendation" and "'invite[s] and encourage[s]' an investor to hire ISS for its proxy voting advice." *Id.*

Although the Supreme Court is revisiting the *Chevron* doctrine, and may curtail or do away with it, *see Loper Bright Enters. v. Raimondo*, No. 22-451 (S. Ct. argued Jan. 17, 2024), this court remains bound by it.   Under the *Chevron* framework, "'[w]hen a court reviews an agency's construction of the statute which it administers, it is confronted with two questions.'"   *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) (quoting *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)).   "First, applying the ordinary tools of statutory construction, the court must determine 'whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"   *Id.* (quoting *Chevron*, 467 U.S. at 842–43).   However, "'if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'"   *Id.* (quoting *Chevron*, 467 U.S. at 843).   "Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency."   *Id.*   Here, because Plaintiff's definition-related claims can be resolved at *Chevron* step one, the court does not defer to the agency's interpretation of the term "solicit" in Section 14(a) nor assess its reasonableness.

Section 14(a) of the Exchange Act makes it "unlawful for any person" to "solicit" any proxy in violation of the SEC's proxy rules.  15 U.S.C. § 78n.  As noted earlier, Congress did not define the term "solicit" in the Act.  So, the court looks to the ordinary meaning of that term at the time of the Exchange Act's enactment, as well as the history and purpose of the statute.  *See Amoco Prod. Co. v. S. Ute Indian Tribe*, 526 U.S. 865, 873–74 (1999) (stating that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning at the

time Congress enacted the statute"); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 989 (2005) (considering the history of the act at *Chevron*'s first step).

2.

As the parties' do, the court first looks to dictionaries in use at the time of the Exchange Act's enactment. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). In 1934, many dictionaries defined the term "solicit" to mean some variant of endeavoring to secure an action or object from another by actively pleading or asking. The words "entreat" and "importune" invariably appeared among the meanings of the term. The Oxford English Dictionary, for example, defined "solicit" to mean "[t]o entreat or petition (a person) for, or to do, something; to urge; importune; to ask earnestly or persistently." THE OXFORD ENGLISH DICTIONARY, Volume X, 395 (1933). The definition in the Concise Oxford Dictionary of Current English was to "invite, make appeals or requests to, importune." THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH 1150 (2d ed. 1931). Various Webster's dictionaries defined "solicit" similarly. Webster's New International Dictionary of the English Language defined the term to mean "[t]o make petition to; to entreat; importune . . . now, often, to approach with a request or plea, as in selling, begging, etc." and "[t]o endeavor to obtain by asking or pleading; to plead for . . . to seek eagerly or actively." NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 2393 (2d ed. 1934); *see also* WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1991 (Reference History ed. 1933) ("2. To endeavor to obtain by asking or pleading"). And Webster's Collegiate Dictionary's definition was "[t]o ask earnestly; petition" and "to cite to action; plead for." WEBSTER'S COLLEGIATE DICTIONARY 916 (3d ed. 1929).

Legal dictionaries from that period offered similar definitions. Black's Law Dictionary, for instance, defined "solicit" as "[t]o ask for with earnestness, to make petition to, to endeavor to obtain, to awake or excite to action, to appeal to, or to invite." BLACK'S LAW DICTIONARY 1639 (3d ed. 1933) (citations omitted). A Dictionary of the Law's definition of "solicit" was "[t]o importune, entreat, implore, ask, attempt, try to obtain." William C. Anderson, A DICTIONARY OF THE LAW 959 (1913).[6]

### a.

The SEC acknowledges this common definition of "solicit," but argues in favor of a different meaning that better captures the giving of proxy voting advice. The agency's favored definition is derived solely from Webster's New International Dictionary published in 1934. SEC Mem. at 2. Among the 10 definitions of "solicit" contained in that dictionary are "[t]o move to action; to serve as an urge or incentive to; to incite. *Now rare*" and "[t]o urge (one's cause, point, etc.); to insist upon; to plead for. *Now rare.*" *Id.* (quoting WEBSTER'S NEW INTERNATIONAL DICTIONARY 2393 (2d ed. 1934)). The SEC argues that these definitions "do not necessarily imply an interest in obtaining a particular outcome, but rather focus on the nature and effect of the communication." *Id.* The agency said something similar during the rulemaking process: citing the same Webster's New International Dictionary, the agency observed that under the definition "to move to action" "what matters is not the subjective intent to obtain a proxy, but rather the effect on a recipient's proxy vote." 85 Fed. Reg. at 55092. It added that the meaning "to move to action"

---

[6] Other legal dictionaries from that time do not provide an ordinary definition of "solicitation," but explain the word's meaning in the criminal context. *See* BOUVIER'S LAW DICTIONARY 1119 (1934) ("Solicitation to commit a crime is usually held to be punishable as a misdemeanor, though the offense solicited may not be committed"); James A. Ballentine, LAW DICTIONARY WITH PRONUNCIATIONS 1213 (1930) ("The offense of inciting another person to commit a crime which especially affects public society.").

is "more consistent with Section 14(a)'s provisions and purposes." *Id.*  NAM agrees with this reading of the Act.  NAM Mem. at 15–16.

The court does not.  "That a definition is broad enough to encompass one sense of a word does not establish that the word is *ordinarily* understood in that sense." *Taniguchi*, 566 U.S. at 568.  *Taniguchi* exemplifies this principle.  There, the dispute was whether the term "interpreter" for purposes of the Court Interpreters Act included document translators.  *See id.* at 566.  A host of contemporary dictionaries defined the term to reach only oral translations.  *See id.* at 566–67. One dictionary, however, defined an "interpreter" as "one that translates; *esp*: a person who translates orally for parties conversing in different tongues." *Id.* at 567–68.  The respondent pointed to the general definition "one that translates" as evidence that an "interpreter" included those who translate documents.  *Id.* at 568. The Court rejected the argument.  It held that the broader definition did not convey the *ordinary* meaning, in part because the "sense divider *esp* (for especially)" signaled that one "who translates orally" was the most common meaning.  *Id.*  "The fact that the definition of 'interpreter' in Webster's Third has a sense divider denoting the most common usage suggests that other usages, although acceptable, might not be common or ordinary." *Id.*  The Court also noted that, although the Oxford English Dictionary also included as a definition "a translator of books or writings," the dictionary indicated that the definition was "obsolete." *Id.* at 566–67.  "Any definition of a word that is absent from many dictionaries and is deemed obsolete in others is hardly a common or ordinary meaning." *Id.* at 569.

A similar definitional analysis applies here.  Webster's New International Dictionary indicates that the SEC's favored definitions are "*Now Rare*."  That "usage label" means that "[t]he word or meaning is not used much today but was in general use in the past."  WEBSTER'S NEW WORLD DICTIONARY vii (4th ed. 2013); *see also* WEBSTER'S NEW WORLD DICTIONARY, THIRD

COLLEGE EDITION xvi (1988) ("'Now Rare' suggests it was once common but, although not archaic, is now not often used.").[7]  Accordingly, "[t]o move to action," [t]o urge to action," "to serve as an urge or incentive to," and "to incite" were no longer ordinary meanings of "solicit" when Congress enacted the Exchange Act in 1934.

Other dictionaries confirm as much.  They do not define "solicit" in the way that the SEC wishes.  The Oxford English Dictionary, for example, contains alternative definitions of "solicit" to include "[t]o incite" and "[t]o incite or move."  THE OXFORD ENGLISH DICTIONARY, Volume X, 395 (1933).  But "[t]o incite" is part of the definition "[t]o incite, draw on, allure, by some specious representation or argument."  *Id.*  And "[t]o incite or move" introduces the definition "[t]o incite or move, to induce or persuade, to some act of lawlessness or insubordination."  *Id.*  Neither of those definitions applies to proxy voting advice.  Proxy voting advisors do not "incite" by "specious representation or argument."  Nor do they "move" their clients "to some act of lawlessness or insubordination."  The court expects that the Oxford English Dictionary, "one of the most authoritative [dictionaries] on the English language," *Taniguchi*, 566 U.S. at 569, would contain the SEC's favored definitions if they were indeed common in 1934, but they are nowhere to be found.  *See also* THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH 1151 (2d ed. 1931) (definition of "solicit" that does not include "to move to action," "to urge to action," etc.).

The 1933 version of Black's Law Dictionary does not support a different conclusion.  A component of its definition of "solicit" is "to awake or excite to action."  BLACK'S LAW DICTIONARY at 1639.  Black's contextualizes the definition as follows: "The term [solicit] implies personal petition and importunity addressed to a particular individual to do some particular thing." *Id.* (citing *Golden & Co. v. Justice's Ct. of Woodland Tp., Yolo Cnty.*, 140 P. 49, 58 (Cal. Ct. App.

---

[7] Unlike these later dictionaries, the 1934 edition of Webster's New International Dictionary does not contain a preface defining "now rare."

1914)).  The case that Black's cites, *Golden & Co.*, illustrates how solicitation was understood to mean "awakening" or "inciting" in 1914.  There, the question was whether the term "solicit orders" for alcohol included mailing letters offering items for sale to individuals residing in a dry county from outside the county.  140 P. at 58.  The court found that it did.  It concluded that the letters constituted a "solicitation" because they "vigorously importun[ed]" a person to make a purchase that would financially benefit the letter's sender.  *Id.* at 58.  Thus, "awakening" or "inciting," as used in Black's and *Golden & Co.*, does not capture the act of advising a client on how to vote on corporate ballot measures.  Proxy advisors do not "vigorously importune" clients to vote in a certain way to benefit themselves.

**b.**

Beyond dictionaries, the SEC also appeals to judicial decisions from the time of the Exchange Act's passage as further proof that an ordinary meaning of "solicit" in 1934 was "to move to action."  SEC Mem. at 22;[8] *see also Taniguchi*, 566 U.S. at 573 (considering judicial interpretations of related terms and concepts to determine ordinary meaning).  It cites to three old cases.  *In re Grobe's Estate*, 102 N.W. 804 (Iowa 1905), involved a public policy prohibiting the payment of a fee to a third party for "advice and solicitation" of another "with reference to carrying out a marriage contract."  *Id.* at 805.  *Herbert v. Long*, 23 S.W. 658 (Ky. Ct. App. 1893), concerned a challenge to a will on the grounds that a son had "solicited his father to make his will, or so alter it, as to keep the estate in the family of the son."  *Id.* at 659.  And *Fuller v. Dame*, 35 Mass. 472 (Mass. 1836), applied the principle that "any promise to pay another for soliciting a will in his favor, would be void."  *Id.* at 481.

---

[8] The SEC also cites several more recent cases considering the meaning of "solicit," SEC Mem. at 22, but those cases have little probative value in discerning the ordinary meaning of the word in 1934 when the Exchange Act became law.

In each of these cases, the verb "solicit" is best understood to mean to "endeavor to obtain by asking or pleading" or "to importune" or "entreat," not merely to "move to action." WEBSTER'S NEW INTERNATIONAL DICTIONARY at 2393. The third parties in *Grobe's Estate* and *Fuller* were paid fees to ask or plead for a particular outcome. The son in *Herbert* likewise asked or pleaded with his father to change his will. The SEC's preferred, "now rare" definition of "move to action" does not comport—at least in an ordinary sense—with how the term "solicit" is used in these cases.

<b>c.</b>

NAM offers several additional definitions of "solicit" contained in Webster's New International Dictionary that it argues encompass giving proxy voting advice. It puts forward the alternative meanings "serve as a lure to," "bring about," "attract," and "tempt." NAM Mem. at 15–16. Weaving those definitions together, NAM asserts that "proxy voting advice 'serve[s] as a . . . lure to' an investor to vote in a certain way; it tends to 'bring about' a vote by 'attract[ing]' or 'tempt[ing]' the shareholder." *Id.* at 16.

But NAM's alternative definitions either do not reflect the ordinary meaning of "solicit" in 1934, or their meaning in context is a poor fit for describing proxy voting advice. "Serves as a lure" and "attract" are components of the definition "[t]o serve as a temptation or lure to; to attract; often, to kindle (desire, etc.)." WEBSTER'S NEW INTERNATIONAL DICTIONARY at 2394. Proxy voting advisors may do many things, but "serv[ing] as a temptation" or "kindl[ing]" "desire" are not among them.

To "bring about" is part of the definition "[t]o draw on, out, together, etc., by physical attraction, force, or means; to bring about, forth, on, etc., by gentle or natural operations; to seek to induce or elicit; as to solicit a dart from a wound or peristaltic movements. *Now Rare*." *Id.*

25

That definition plainly does not apply, and its "now rare" signal underscores that the definition did not convey the ordinary meaning at the time.

The words "tempt" and "lure" appear in yet a third alternative definition: "[t]o tempt (a person); to lure on, *esp*. into evil; to attempt to seduce; *specif.*, of a woman, to accost (a man) for immoral purposes." *Id*. (emphasis added). Little need be said about why that definition does not work in the context of Section 14(a). *Cf. Taniguchi*, 566 U.S. at 568 (explaining that the "sense divider *esp* (for especially) indicates . . . the most common meaning").

### d.

In the alternative, NAM accepts Plaintiff's preferred definition—"endeavor to obtain"—and contends that proxy voting advice comfortably fits within it. NAM argues that a proxy voting advisor "'endeavor[s] to obtain' a vote in line with its recommendation." NAM Mem. at 13. NAM further points out that Plaintiff has a practice of "robo-voting," in which it automatically casts votes for some clients. *See id.* at 13–14. That, according to NAM, is "proof positive" that Plaintiff does not act as a mere neutral advisor but seeks to achieve a certain outcome—that is, "a vote in line with [its] recommendations." *Id.* at 14. Finally, NAM offers the example of a corporate manager who offers to advise a shareholder on how to vote and then says, "I'll automatically cast your vote on your behalf in line with my recommendations." *Id.* at 13. No one, NAM contends, would contest that such an offer would constitute solicitation of a proxy, and such an offer from a proxy voting advisor should be treated precisely the same way. The court rejects each of these arguments.

*First*, it is awkward to describe a proxy advisory firm as "soliciting"—that is, "endeavor[ing] to obtain"—"a vote in line with its recommendation." Take a different type of advisor: a criminal defense lawyer. The lawyer may "solicit" a plea bargain from the government

on behalf of the client.  But one ordinarily would not say that when an attorney is advising their client on whether to accept a plea bargain the lawyer is "soliciting," or "endeavor[ing] to obtain," "a [plea] in line with [her] recommendation."  The lawyer seeks to convince the client to follow her advice, but the lawyer is not trying to obtain the *object* of that advice—the offered plea bargain.  In the same vein, a proxy advisory firm offers advice on *how* to vote, but it does not seek to obtain a proxy.

*Second*, NAM is correct that, for some clients, Plaintiff does more than simply provide advice; it also casts votes.  But the casting of a client-shareholder's vote does not turn the advisor's advice into a "solicitation."  Again, consider the criminal defense lawyer.  No one would reasonably say that counsel's communication of the client's decision to the government makes the advice itself a "solicitation."  The same is true of proxy voting advice.  An advisor's administrative act of casting a vote consistent with its advice does not make the advice itself a "solicitation."

*Third*, NAM's analogy to a corporate manager who offers to advise and cast a shareholder's vote breaks down because the manager has an inherent interest in the vote's outcome, whereas the proxy advisor does not.  The manager's advice can be presumed as directed towards obtaining a favorable vote for the company.  A proxy advisor, whose obligations run only to her client, has no such personal interest.  As NAM points out, the SEC may have harbored doubts about whether proxy advisory firms truly are disinterested in a vote's outcome, *id.* at 14, but such concerns were not part of the agency's rationale for the definitional amendment.  Thus, those concerns cannot in litigation sustain the agency's action.  *See Ass'n of Civilian Technicians v. Fed. Lab. Rels. Auth.*, 269 F.3d 1112, 1117 (D.C. Cir. 2001) ("Agency decisions must generally be affirmed on the grounds stated in them.  Post-hoc rationalizations, developed for litigation are insufficient.") (citations omitted).

**e.**

The agency offers several more recent cases, which it claims stand for two propositions: (1) that "proxy solicitation has encompassed communications that do not themselves request or seek to obtain anything," and (2) that an interest in a vote's outcome is but one factor to consider as part of an objective inquiry into determining whether a communication qualifies as a "solicitation."  SEC Mem. at 23–24 (citing *Gas Nat. Inc. v. Osborne*, 624 F. App'x 944 (6th Cir. 2015); *Long Island Lighting Co. v. Barbash*, 779 F.2d 793 (2d Cir. 1985); *Sargent v. Genesco, Inc.*, 492 F.2d 750 (5th Cir. 1974); *Dyer v. SEC*, 291 F.2d 774 (8th Cir. 1961)).  None of these cases unsettle the court's conclusion.

Setting aside that these cases all involve the *agency's* regulatory definition of "solicit"— as opposed to the term's ordinary meaning as used in Section 14(a)—the court does not quibble with how the SEC describes them.  Courts consistently have held that communications that on their face did not seek to provide, withhold, or revoke a proxy nevertheless were covered "solicitations" because the communication was "a step in a chain of communications designed ultimately to accomplish such a result."  *Long Island Lighting*, 779 F.2d at 796.  Likewise, courts have found the solicitation inquiry to be an objective one based on the nature and circumstances of the communication. *See, e.g.*, *id.*; *Osborne*, 624 F. App'x. at 949–50.

But *none* of these cases involved a communication by a disinterested individual.  *Osborne* involved letters written to shareholders by the defendant company's former chairman, who conceded that he had sent three letters to shareholders critical of the company and its management, both before and after a shareholder meeting, as steps "to regain control of the company." 624 F. App'x. at 947.  *Long Island Lighting* held that newspaper and radio ads purchased by a minority shareholder seeking to unseat the board of directors could constitute solicitation.

779 F.2d at 796.[9]  *Sargent* concerned a letter sent by management whose alleged purpose was to "forestall the common shareholders from interposing obstacles in the path of the refinancing plan through the exercise of their rights as shareholders."  492 F.2d at 767.  And *Dyer* involved a postcard sent to stockholders by a minority shareholder who "had a substantial interest in the outcome of the proxy solicitation by reason of his eight proposals . . . included in management's proxy statement[.]"  291 F.2d at 778.

The agency acknowledges these factual differences, but nevertheless argues that what matters is "'the nature of the communication and the circumstances under which it was distributed,' not the speaker's interest or motivation."  Reply Mem. in Supp. of SEC's Mot., ECF No. 47, at 4 (quoting *Long Island Lighting*, 779 F.2d at 796).  But that distinction is untenable.  A speaker's interest and motivation *are* part of the circumstances under which a message is distributed, and those components are crucial to discerning its nature and purpose.  The SEC's attempt to separate the two blinks reality.  In sum, none of the cases cited by the agency support Defendants' position that proxy voting advice for a fee is "solicitation" within the ordinary meaning of the term.

## 3.

Each party also contends that its position better reflects the purposes and history of Section 14(a).  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) (considering statutory history at *Chevron* step one); *Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 546 (2009) (same).  Plaintiff has the better of this argument.

---

[9] The court did not conclusively rule that the advertisements were covered solicitations because the trial court had prematurely terminated discovery.

**a.**

Quoting from the Exchange Act's legislative history, the Supreme Court has observed that Section 14(a) "stemmed from the congressional belief that 'fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange.'" *Borak*, 377 U.S. at 431 (quoting H.R. REP. No. 1383, 73d Cong., 2d Sess., 13). The statute "was intended to 'control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which . . . (had) frustrated the free exercise of the voting rights of stockholders.'" *Id.* (quoting H.R. REP. No. 1383 at 14). "'Too often proxies are solicited without explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.'" *Id.* (quoting S. REP. No. 792, 73d Cong., 2d Sess., 12).

From this history, the Court concluded that "[t]he purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *Id.* Thus, Congress's focus in adopting Section 14(a) was to promote transparency and the exchange of complete and truthful information by and among interested parties seeking to obtain proxies in connection with a shareholder vote. *See Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 421–22 (D.C. Cir. 1992) ("[S]ection 14(a) shelters use of the proxy solicitation process as a means by which stockholders may become informed about management policies and may communicate with each other.").

The regulation of proxy voting advice as "solicitation" would seem to do little to advance these legislative purposes. By definition, proxy advisory firms are hired by a shareholder to provide *confidential* advice to the shareholder with respect to a corporate ballot measure. Their advice is not for *all* shareholders or for management consumption. It is exclusively for the investor

that hires them.  Thus, the risk that a proxy advisor's advice will deceive or mislead an ordinary, non-client shareholder is minimal.

Further, proxy advisors are in no position to conceal the "real nature" for seeking a proxy because they have no financial or governance interest in the outcome of a vote.  Their advice will be tailored to the client's interests, not their own.  This puts proxy advisors is a very different posture vis à vis the ordinary shareholder compared to, say, management or an activist investor.

Finally, litigation risk constrains proxy advisors.  A proxy advisory firm that deceives a client or fails to act in a client's interests presumably is subject to common law torts, including malpractice and fraud.  Similar causes of action arguably are less tenable against management or another shareholder that seeks a proxy.  Thus, the need for agency oversight under Section 14(a) over proxy advisors is even further diminished by the prospect of tort liability.

### b.

The SEC also believes that the regulatory scheme envisioned by Congress bolsters its position.  SEC Mem. at 26.  It points out that Congress did not define "solicit" or "solicitation," and it vested the agency with broad rulemaking authority, including crafting undefined terms.  *Id.* But "[a]n agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority."  *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006).  Indeed, "[r]egardless of how serious the problem an administrative agency seeks to address, . . . [an agency] may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *Brown & Williamson Tobacco*, 529 U.S. at 125.  Ultimately, the ordinary meaning of the statutory text controls, and it cannot be overcome by a broad grant of rulemaking authority.  *See Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1174 (D.C. Cir. 2003) ("An agency construction

of a statute cannot survive judicial review if a contested regulation reflects an action that exceeds the agency's authority.").

**c.**

NAM takes a different tack when it comes to "the structure and history of the Exchange Act." NAM Mem. at 16. It makes two arguments. First, NAM contends that because Congress has not disapproved of the SEC's longstanding interpretation of proxy voting advice as "solicitation," it has acquiesced to the SEC's understanding of that term. Second, NAM points out that in more recent legislation amending the Exchange Act, Congress reused the term "solicit any proxy." Pub. L. No. 103-202, § 302, 107 Stat. 2344, 2395 (1993) (codified at 15 U.S.C. § 78n(h)(1)). Because Congress is presumed to legislate against settled administrative interpretations, NAM says, the court can be confident that Congress understood that "solicitation" included proxy voting advice when it made the amendment. The court is unpersuaded.

The Supreme Court has observed that, "[a]lthough we have recognized congressional acquiescence to administrative interpretations of a statute in some situations, we have done so with extreme care." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 (2001). Absent "overwhelming evidence," the Court has been "loath to replace the plain text and original understanding of a statute with an amended agency interpretation." *Id.* at 169 n.5.

Here, there is scant evidence of congressional acquiescence. Unlike in *Solid Waste*, Congress has not held hearings or tried but failed to pass legislation on the subject. *See id.*; *see also Jackson v. Modly*, 949 F.3d 763, 773–74 (D.C. Cir. 2020) (finding congressional acquiescence persuasive where Congress had amended various parts of the statute over the year, "including the specific provision at issue," commissioned studies regarding the effectiveness of the statute, and actively legislated in a related area). Nor is there a long pattern of enforcement against proxy

32

advisors under Section 14(a) from which Congress could have taken notice.  *Cf. Wash. All. of Tech. Workers v. Dep't of Homeland Sec.*, 50 F.4th 164, 182–83 (D.C. Cir. 2022) (finding that "evidence of congressional acquiescence abound[ed]" in a case involving a decades-old practice concerning a student visa category, where agency officials testified before Congress numerous times about this practice and Congress repeatedly amended the relevant provisions, yet left the statutory text undisturbed).  In short, there is simply no compelling evidence from which the court can find that Congress was "abundantly aware" of the SEC's treatment of proxy voting advice as "solicitation" and therefore has acquiesced to it.  *Id.* (citing *Bob Jones Univ. v. United States*, 461 U.S. 574, 595, 600–601 (1983))*; see also Rapanos v. United States*, 547 U.S. 715, 750 (2006) (rejecting congressional acquiescence rationale in interpreting a statute).

Nor is Congress's reuse of the term "solicit a proxy" in a later amendment of the Exchange Act evidence that Congress understands that term the way the SEC does.  The Supreme Court has said, "[w]hen administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."  *Bragdon v. Abbott*, 524 U. S. 624, 645 (1998); *see also Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 722 (2018).

But no court has ever been confronted with the question presented here, let alone held that "solicit a proxy" sweeps in proxy voting advice.  And the administrative history confirms that the SEC understood the question remained an open one.  When the agency proposed the rule at issue in 2019, it acknowledged that "the term 'solicit' in Section 14(a) arguably might be construed more narrowly than how the Commission has long interpreted that term.  Under such a view, 'solicitation' arguably might be limited to requests to obtain proxy authority or to obtain

shareholder support for a preferred outcome, which might exclude certain proxy voting advice by a person retained to provide such advice to a client." 84 Fed. Reg. at 66522–23. Although the SEC said that it disagreed with the narrower interpretation, *id.* at 66523, its recognition of a definitional dispute in 2019 puts to rest the notion that, when Congress amended the Exchange Act more than 25 years earlier in 1993, it would have understood the term "solicit" in Section 14(a) to reach proxy voting advice.

## V.

In sum, the court holds, at *Chevron* step one, the ordinary meaning of "solicit" at the time of Section 14(a)'s enactment does not reach proxy voting advice for a fee. Nor does the Exchange Act's history and purpose support the SEC's reading. The court therefore has no cause to move to *Chevron* step two and afford deference to the agency's position.

By defining the terms "solicit" and "solicitation" in the proxy rules to include proxy voting advice for a fee, *see* 17 C.F.R. § 240.14a-1(l)(1)(iii)(A), the SEC acted contrary to law and in excess of statutory authority, 5 U.S.C. § 706(2)(A), (C). Accordingly, the court grants summary judgment in favor of Plaintiff as to Counts I and II, denies the SEC's and NAM's cross-motions, and vacates the definitional amendment codified at 17 C.F.R. § 240.14a-1(l)(1)(iii)(A). *See* 5 U.S.C. § 706(2)(C) (stating that courts must "set aside agency action" if found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").[10]

A final, appealable order accompanies this memorandum opinion.

Dated: February 23, 2024

Amit P. Mehta
United States District Judge

---

[10] In light of the court's ruling, the court does not address Plaintiff's arbitrary and capricious claims in Counts III and IV.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| **INSTITUTIONAL SHAREHOLDER** | ) | |
| **SERVICES INC.,** | ) | |
|  | ) | |
| **Plaintiff,** | ) | |
|  | ) | |
| v. | ) | **Civil No. 19-cv-3275 (APM)** |
|  | ) | |
| **SECURITIES AND** | ) | |
| **EXCHANGE COMMISSION et al.,** | ) | |
|  | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## ORDER

For the reasons set forth in the court's Memorandum Opinion, ECF No. 69, the court grants Plaintiff's Motion for Summary Judgment as to Counts I and II, ECF No. 20, and denies Defendants' Cross-Motions for Summary Judgment, ECF Nos. 33-1, 35.   The definitional amendment codified at 17 C.F.R. § 240.14a-1(l)(1)(iii)(A) is hereby vacated.

This is a final, appealable order.

Dated:  February 23, 2024

_____
Amit P. Mehta
United States District Court Judge